**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ANNETTE E. VELEZ,

      Plaintiff,

 v.

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

Civ. Action No. 19-08182 (FLW)

**OPINION**

**WOLFSON, Chief Judge**:

   Plaintiff Annette E. Velez ("Plaintiff") seeks review of a final decision of the Commissioner of Social Security ("Commissioner"), which denied Plaintiff's application for disability insurance benefits under Title II and Title XVI of the Social Security Act (the "Act"), for the period beginning on July 30, 2013 and continuing through December 6, 2017.  This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Plaintiff was 45 years old at her alleged onset date, has a high school education, and previously has worked as a receptionist.  She filed for disability insurance benefits on July 31, 2014.  In this appeal, Plaintiff contends that the Commissioner's determination—which found that Plaintiff was not disabled prior to December 7, 2017—is based on an incorrect application of the law and is not supported by substantial evidence.  After reviewing the administrative record, the Court finds that the Commissioner, acting through an Administrative Law Judge ("ALJ"), pursuant to 20 C.F.R. 416.1429 *et seq.*, correctly applied the law and based his decision on substantial evidence. Accordingly, for the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

1

I.  **BACKGROUND**[1]

    A.    Plaintiff's Medical History

          1)    *Rheumatologic Conditions; Diagnosis of Lupus and Fibromyalgia*

Plaintiff has had a longstanding history of rheumatologic conditions since when she was diagnosed with systemic lupus erythematosus in 2002. (Tr. 124, 559.)[2] In August 2013, she complained to her rheumatologist, Gerald Ferencz, M.D., of numbness and tingling with her fingers and dry skin because she had been washing so many dishes. (Tr. 431). At this visit, her muscle tone and strength were normal in her bilateral upper and lower extremities, and she showed no signs of atrophy (Tr. 432.) Dr. Ferencz started her on medications and steroids and felt that "should be adequate to treat her symptoms and control her lupus." (Tr. 543.)

In September 2013, Plaintiff saw her neurologist, Vasko K. Gulevski, M.D., for tingling and numbness in her hands and feet. (Tr. 521.) Dr. Gulevski found that Plaintiff's motor strength was full (5/5) in her bilateral upper and lower extremities, and she exhibited no muscle tenderness or atrophy. (Tr. 522.) Her gait was normal. (Tr. 522.) An EMG test showed no evidence of

---

[1] Because I write solely for the benefits of the parties, I only briefly summarize the essential facts of this case as they have been provided to the Court by the parties in their respective briefs. I also note that, while Plaintiff's brief contains a section entitled "Procedural History/Statement of Facts," that section does not contain any references to Plaintiff's medical history from the administrative record. *Cf.* L. Civ. R. 9.1 (stating, in relevant part, that in any "Social Security case . . . Plaintiff's brief shall contain . . . a statement of facts with references to the administrative level"). The other sections of Plaintiff's brief also contain only very limited references to the administrative record. Indeed, in the entirety of Plaintiff's brief, there is just one reference to Plaintiff's medical history as found in the administrative record. (*See* Pl.'s Br. at 28 (citing to evidence in the administrative record from "plaintiff's treating psychiatrists (Tr. 1047-1080, 1107-1139) as well as the Commissioner's psychological examiners (Tr. 869-873, 1140-1143)"). In contrast, Defendant's brief contains a detailed statement of facts, with plentiful references to the administrative record.

[2] References to "Tr." are to the administrative record, which was electronically filed by Defendant, pursuant to L. Civ. R. 9.1(c)(1). (*See* ECF No. 6.) The Court notes that portions of the administrative record are not text searchable. To assist the Court in its review of the record in subsequent cases, the Court requests that the parties ensure that all PDFs are text searchable before filing such documents. *See* L. Civ. R. 1(h) (stating that "PDF documents should be text searchable").

carpal tunnel or right cervical radiculopathy, while an NCS of her lower extremities revealed mild peroneal neuropathy on the left side. (Tr. 525, 529, 676-77.) A needle exam of Plaintiff's S1 muscles and lumbar paraspinals was normal, indicating early and mild neuropathy. (Tr. 529, 676-77.)

In October 2013, Dr. Gulevski noted that an MRI of Plaintiff's cervical spine was unremarkable despite having a syrinx in 2012. (Tr. 531.) According to an EMG, Plaintiff's upper extremities were normal, and her lower extremities showed mild slowing in nerve conditions. (Tr. 531.) Plaintiff again displayed full (5/5) muscle strength, no atrophy, and no muscle tenderness. (Tr. 531.) She was alert and oriented with no cognitive deficits. (Tr. 531.) Dr. Gulevski recommended physical therapy. (Tr. 532.) Later that month, Dr. Ferencz also recommended Plaintiff start physical therapy, and noted that the numbness in Plaintiff's fingertips was improving. (Tr. 506.)

By the end of 2013, Plaintiff's muscle tone and strength continued to be normal, her gait was normal, and her joints (shoulder, wrists, elbows, hips, knees, ankles) displayed normal ranges of motion, she had mild cervical spine tenderness, and no tenderness in her thoracic and lumbar spine. (Tr. 644.) In December 2013, Marianthi Kiriakidou, M.D., diagnosed Plaintiff with fibromyalgia, noting that her proximal and distal fibromyalgia tender points were strongly positive. (Tr. 644.) Plaintiff saw Dr. Kiriakidou again in January 2014, during which time she displayed normal muscle tone and strength in the upper and lower extremities, a normal gait, and normal ranges of motion in her joints. (Tr. 539-40.)

Dr. Gulevski similarly noted, during a revisit in January 2014, that Plaintiff exhibited full (5/5) strength in her muscles with no atrophy, no tenderness, and a normal gait. (Tr. 533-34.) Plaintiff followed up with Dr. Gulevski on February 28, 2014, after a lumbar puncture. (Tr. 535.)

Although Plaintiff's labs showed increased oligoclonal bands, they were otherwise "relatively unremarkable." (Tr. 535.) She exhibited full strength (5/5) in her muscles with no atrophy or tenderness, and her gait was normal. (Tr. 535, 536.)

In March 2014, an ultrasound of Plaintiff's right hand was unremarkable. (Tr. 678.) At a visit with her primary care physician, Joan Choper, M.D., Plaintiff complained of muscle pain and stiffness, although upon examination, Plaintiff exhibited a normal gait and posture, normal upper and lower extremity muscle strength, normal range of motion in her joints, and no tenderness over the spine. (Tr. 747, 749.) Her mood, affect, attention, and concentration were all normal. (Tr. 749.) In April 2014, Dr. Kiriakidou remarked that imaging of Plaintiff's hands did not support active inflammatory arthritis (Tr. 694). She suggested that Plaintiff try aqua therapy (Tr. 694).

Plaintiff did not see a physician for her lupus until July 28, 2014, when she saw Dr. Choper and complained of a lupus flare. (Tr. 735.) Plaintiff admitted to being noncompliant with her diet and to not checking her blood sugars regularly, which had increased, but then returned to normal levels after she went back on her diabetic program. (Tr. 735.) Although Plaintiff complained of muscle pain and tingling, her gait and posture were normal and her muscle strength in her upper and lower extremities was normal. (Tr. 738.) She exhibited no swelling, tenderness, defects, or deformities in her joints. (Tr. 738.) Her mood, affect, attention, and concentration were normal. (Tr. 738.) Plaintiff saw Dr. Gulevski on August 11, 2014. (Tr. 1040.) At this visit, her motor strength was full (5/5) and she had no atrophy or tenderness. (Tr. 1040-41.) Her gait was normal. (Tr. 1041.)

Plaintiff did not visit her treating physicians again until December 2014. During a visit with Dr. Choper, Plaintiff's sugar levels were high, and she admitted to not eating well. (Tr. 971.) Although she complained of pain, her gait and posture were normal, and she had normal muscle

4

strength in her upper and lower extremities. (Tr. 974.) Her joints were not swollen and had no defects or deformities. (Tr. 974.) She was alert, cooperative, and displayed normal attention and concentration. (Tr. 974.) Dr. Gulevski noted during a visit that Plaintiff was doing relatively the same. (Tr. 1042.) She exhibited full (5/5) strength with no atrophy or tenderness in her muscles. (Tr. 1043.) Her gait was normal. (Tr. 1043.) Dr. Kiriakidou similarly noted that Plaintiff's muscle tone and strength were normal, and although she had pain in her left shoulder, her right shoulder, elbow, wrists, and other joints all exhibited normal ranges of motion. (Tr. 890.) Plaintiff's normal muscle strength and normal physical examination findings continued into January 2015. (Tr. 1044-45.)

By April 2015, Plaintiff explained to Dr. Choper that she had stopped certain medications because she and her mother "decided she was on too many medications." (Tr. 1089.) Plaintiff's blood sugars were better, and Plaintiff was complying with her diet. (Tr. 1089.) Plaintiff ambulated with a normal gait and posture and exhibited normal muscle strength in her upper and lower extremities. (Tr. 1092.) She had no swelling, tenderness, defects, or deformities in her joints and back, and no tenderness over her spine. (Tr. 1092.) Her mood, affect, attention, and concentration were all normal. (Tr. 1092.) At the time of Plaintiff's hearing before an ALJ in July 2017, Plaintiff was no longer undergoing treatment for lupus. (Tr. 124.) She explained to the ALJ that medications reduced her lupus symptoms. (Tr. 124-25.)

        2)    *<u>Independent Medical Exam</u>*

In October 2014, Plaintiff underwent an Independent Medical Exam with Francky Merlin, M.D. (Tr. 862-64.) Plaintiff told Dr. Merlin she was diagnosed with high blood pressure in 2011, but she had not been hospitalized for uncontrolled high blood pressure and denied ophthalmologic, cardiac, renal, or neurological involvement. (Tr. 862.) Plaintiff also confirmed that she had a 17-year history of diabetes for which she had never been hospitalized and for which she took

medications. (Tr. 862.) It was noted that Plaintiff was diagnosed with lupus 11 years ago and, in 2013, developed joint pain. (Tr. 862.) It was also noted that no other organ was involved with her lupus. (Tr. 862.) Plaintiff reported she could do household chores, walk less than a block, and take care of her personal hygiene. (Tr. 862.)

Upon physical examination, Plaintiff was found to be well-developed, well-nourished, and in no acute distress. (Tr. 863.) Her affect and behavior were appropriate. (Tr. 863.) Her station was normal, and although her gait was antalgic, she had no issues getting up from a sitting position or getting on and off the examining table. (Tr. 863.) Her grip strength and manipulative functions were not impaired. (Tr. 863.) She was able to flex her spine and walk on her heels and toes but was not able to squat. (Tr. 863.) Her motor strength was full (5/5) bilaterally. (Tr. 863.) Dr. Merlin concluded that Plaintiff could sit, stand, walk, hear, and speak. (Tr. 864.)

        3) *Mental Health History*

Prior to her July 30, 2013 alleged onset date, Plaintiff's husband left her, and she became depressed. (Tr. 549-50, 711.) She sought mental health treatment at Life Excel, LLC, where she told her providers in June that her husband had moved out and she was having difficulties dealing with her youngest child, who had bipolar disorder and was a "problematic" child. (Tr. 711, 716.) She confessed that she was experiencing difficulties at work and went on a trip to Pennsylvania to participate in a two-day walk for cancer with her brother and her sister in law for the weekend. (Tr. 715.) She drank wine daily. (Tr. 708.)

Plaintiff improved in July 2013. (Tr. 704.) By July 15, 2013, Plaintiff told her providers that she was feeling much better and had stopped drinking. (Tr. 705.) Plaintiff's mood and affect were normal, her thought process was logical, her thought content was normal, and Plaintiff's memory, attention, and insight were all normal. (Tr. 706.) On July 21, 2013, although she had

thoughts of self-harm, Plaintiff focused on her daughter and "all they went through to get where she is today" and her support systems of her mother and sister. (Tr. 714.)

Plaintiff did not seek mental health treatment again until September 16, 2013. (Tr. 710.) During this visit, she explained that although she had lost her job, she was doing "ok" with "no major issues." (Tr. 710.) Plaintiff had no physical complaints, and a review of her systems was normal. (Tr. 710.) At her next visit in January 2014, Plaintiff was angry and irritable. (Tr. 703.) She had no physical complaints, and a review of her systems was normal. (Tr. 703.) By February 2014, Plaintiff was feeling "much better," was "not anxious" and her "depression [was] improving." (Tr. 701.) Her mood was stable, she had no physical complaints, and a review of her systems was normal. (Tr. 701.) She exhibited a normal mood, appropriate affect, normal thought content, normal memory and attention, adequate insight, and was logical and goal oriented. (Tr. 702.)

Plaintiff remained stable in May 2014. (Tr. 700.) Although she was still depressed, her thought content was normal, her thought process was logical and goal directed, and her memory and attention were normal. (Tr. 700.) She was alert and oriented, and her insight was adequate. (Tr. 700.) By July 2014, Plaintiff's divorce was still in progress, but she had no anxiety and no depression. (Tr. 697.) A review of her systems was normal, and she had no physical complaints. (Tr. 697.) Her mood and affect were normal, her thought process was logical and goal directed, her thought content was normal, and her memory and attention were normal. (Tr. 698.)

In October 2014, Plaintiff's divorce was still in progress, and she was still experiencing issues with her daughter. (Tr. 1050.) Although she had panic attacks, she responded well to therapy (Tr. 1050.) Plaintiff again had no physical complaints and exhibited a normal mood, affect, thought content, memory, and attention. (Tr. 1051.) Her thought process was logical and

7

goal directed. (Tr. 1051.) Plaintiff's progress was similar in February 2015. She was still going through her divorce, and she was selling her home. (Tr. 1048.) She again had no physical complaints and exhibited a normal mood, affect, thought content, memory, and attention. (Tr. 1048-49.) Her thought process was logical and goal directed. (Tr. 1049.)

On May 3, 2015, Plaintiff voluntarily admitted herself to the hospital with suicidal thoughts, explaining that she was going through a divorce, experiencing financial problems, and potentially losing her home. (Tr. 1114.) Plaintiff admitted to being noncompliant with her outpatient therapy because her youngest daughter had a baby, her car needed new brakes, and she had to take care of her mother. (Tr. 1117.) After her medications were recalibrated, Plaintiff immediately became "brighter," more future oriented, and ceased having thoughts of self-harm. (Tr. 1114.) She had no physical issues and was independent in her activities of daily living. (Tr. 1124, 1129.)

    4)  *Diagnosis with Mild Depression*

On November 25, 2014, Plaintiff underwent an independent mental status examination with Wm. Dennis Coffey, Psy.D. (Tr. 869.) She explained to Dr. Coffey that she stopped working in July 2013 because her depression was "really bad" and she had "hit rock bottom" and gotten fired. (Tr. 869.) Her husband had left her for another woman after 29 years together, and she started drinking alcohol until her family insisted she seek treatment. (Tr. 869.) Plaintiff began outpatient psychiatric treatment in August 2013 and saw a therapist for the past 6 weeks. (Tr. 869.) She had no other outpatient psychiatric treatment and no psychiatric hospitalizations at this point. (Tr. 869.) At this time, she lived with her children and a typical day consisted of drinking coffee, taking care of her hygiene, watching television, cleaning, cooking, and lying in bed. (Tr. 871.) She denied any issues with self-care or grooming, had a driver's license, and was able to drive herself places. (Tr. 871.)

Plaintiff drove herself to the appointment and had no issues completing a basic information form. (Tr. 871.) Her gait was stiff and limp, but she did not use any assistive device and was not in any apparent physical distress while seated. (Tr. 871.) She followed the conversation and participated in the interview. (Tr. 872.) Plaintiff's mood was normal and her affect was appropriate. (Tr. 872.) She was oriented, and although she could not perform serial 7s, she performed serial 3s. (Tr. 872.) She could perform simple mathematical calculations and was able to recall five digits forward and three digits in reverse. (Tr. 872.) She exhibited borderline to low average intelligence, and her insight and judgment were adequate. (Tr. 872.) Dr. Coffey suggested a referral to the Division of Vocational Rehabilitation Services and diagnosed Plaintiff with mild depression. (Tr. 872.)

        5)    *Diagnosis with Adjustment Disorder*

Plaintiff underwent another independent mental status examination with Victoria C. Miller, Ph.D., in June 23, 2015. (Tr. 1141-43.) She drove herself to the appointment. (Tr. 1141.) Upon examination, Plaintiff was cooperative and goal-directed but did not offer any spontaneous conversation (Tr. 1142). She was fully oriented and could spell "world" forwards and backwards (Tr. 1142). Although she could not multiply 9 x 6, she could count by 7's to 49 and register 3 objects immediately with recall (Tr. 1142). Although her concentration was poor, Plaintiff had limited judgment, insight, and fair impulse control with no evidence of any thought disorder (Tr. 1142).

Plaintiff told Dr. Miller she spent her days in bed or on the sofa and had to be told to attend to her hygiene. (Tr. 1143). Everyone in the household was "on their own" with regard to cooking and cleaning. (Tr. 1143.). Her daughter typically did the shopping, and Plaintiff participated in regular counseling and tried to force herself to attend a weekly support group. (Tr. 1143.) Plaintiff engaged primarily with family members and her children, but did not otherwise reach out to

interact with people. (Tr. 1143.) Dr. Miller found that Plaintiff had adequate mentation and could manage her own funds (Tr. 1143). She diagnosed Plaintiff with an adjustment disorder with mixed anxiety and depressed mood (Tr. 1143).

      6)    *Reviews by State Agency*

Two expert state agency physicians reviewed the record and determined that Plaintiff could perform sedentary work. On October 16, 2014, David X. Schneider, M.D., found that Plaintiff could perform sedentary work with additional limitations: occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently balancing; occasionally stooping, kneeling, and crawling; and never crawling. (Tr. 179-80.) Moreover, Plaintiff was limited in reaching in front, laterally, and overhead on the right side. (Tr. 180.) She must avoid moderate exposure to extreme cold and concentrated exposure to extreme heat, wetness, humidity, vibration, fumes, and hazards. (Tr. 180-81.) On reconsideration, Mohammad Rizwan, M.D., affirmed that Plaintiff could perform sedentary work with the additional limitations described above. (Tr. 197-98.)

Furthermore, in December 2014, a psychologist, Sharon Flaherty, reviewed the record and determined that Plaintiff had only mild restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 178.) Her depression was rated mild. (Tr. 178.) Then, on reconsideration in July 2015, Barbara Hernandez, Psy.D., reviewed the record evidence and concluded that Plaintiff had the capacity to perform at least simple tasks. (Tr. 193, 194.) Dr. Hernandez considered Plaintiff's mental admission, along with the independent examination, which described her as having acceptable functioning. (Tr. 193.) Plaintiff had only moderate limitations in restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace (Tr. 193-94.)

10

B.      Procedural History

On July 31, 2014, Plaintiff filed an application for disability insurance benefits, alleging a period of disability beginning on July 30, 2013. (Tr. at 277-278.) Plaintiff based her disability on the following medical conditions: diabetes, lupus, rheumatoid arthritis, high blood pressure, depression, migraines, sleep apnea, neuropathy in the left leg, narcolepsy, and anxiety. (*Id*.) On December 11, 2014, the state agency issued an initial determination finding that Plaintiff was not disabled within the meaning of the Act. (Tr. at 172-184.) On July 9, 2015, the state agency's initial determination was affirmed on reconsideration. (Tr. at 185-204.)

At Plaintiff's request, on July 13, 2017, a hearing was held before an ALJ, at which Plaintiff, who was represented by counsel, and an impartial vocational expert both testified. (Tr. 113-71.) Following the hearing, on December 7, 2017, the ALJ issued a 15-page decision finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 11-32.) In arriving at his decision, the ALJ followed the five-step sequential evaluation process set forth at 20 C.F.R. § 404.1520(b)-(g).[3] (Tr. at 15-28) The ALJ made the following specific findings at each step:

At step one, the ALJ found that Plaintiff "has not engaged in substantial gainful activity since July 30, 2013." (Tr. at 16.) At step two, the ALJ found that Plaintiff "has the following severe impairments: systemic lupus erythematosus, fibromyalgia, syringomyelia, diabetes mellitus, left peroneal neuropathy, obstructive sleep apnea, affective disorder, and anxiety

---

[3]     As explained in more detail below, the Commissioner utilizes a five-step sequential evaluation process that requires the Commissioner (or, in this case, the ALJ) to consider, in sequence, whether a claimant: (1) engaged in "substantial gainful activity" during the alleged period of disability; (2) has a "severe medically determinable physical or mental impairment"; (3) has an impairment "that meets or equals" the requirements of an impairment listed in the regulations; (4) possesses the "residual functional capacity" to return to her "past relevant work"; and (5) if not, whether the claimant can "make an adjustment to other work." *See* 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g).

disorder." (Tr. at 17.) The ALJ also found that these "medically determinable impairments significantly limit the ability [of Plaintiff] to perform basic work activities." (*Id*.)

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id*.) The ALJ explained in his decision:

> In making this determination, I have considered all of the impairments listed in Appendix 1, with particular attention to sections 3.10, 9.00, 11.08, 11.14, and 14.02. However, although the claimant has 'severe' impairments, they do not meet the criteria of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments.

(*Id*.) The ALJ then went on, in more than two pages of analysis, to compare Plaintiff's claimed physical impairments vis-a-vis the listed impairments described at 20 C.F.R., Subpart P, Appendix 1 ("Listed Impairments")—with particular attention, as noted, to the Listed Impairments at sections 3.10, 9.00, 11.08, 11.14, and 14.02. (Tr. at 17-20.) Furthermore, with respect to Plaintiff's claimed mental impairments, the ALJ stated that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listed 12.04 and 12.06." (Tr. at 18.)

At step four, the ALJ found that Plaintiff could not perform her past relevant work as a receptionist. (Tr. at 26.) However, at step five, the ALJ nevertheless found that Plaintiff "has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)," while noting a number of specific exceptions to this determination. (Tr. at 26.) In arriving at this determination regarding the residual functional capacity of Plaintiff, the ALJ stated that he considered "all symptoms and the extent to which [Plaintiff's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including the

12

testimony of the impartial vocational expert. (Tr. at 20.) The ALJ then conducted a review of the relevant evidence and, after setting forth his reasoning in more than eight pages of analysis, concluded that, "considering the claimant's age, education, work experience and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. at 20-28.) Finally, having found that Plaintiff retained the residual capacity to perform other sedentary work, the ALJ concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from July 30, 2013, through the date of this decision." (Tr. at 28.)

Thereafter, Plaintiff sought further review by the Appeals Council and, on January 10, 2019, the Appeals Council issued a new decision. (Tr. at 1-10.) In its decision, the Appeals Council adopted the ALJ's findings that Plaintiff was not disabled from July 30, 2013 through December 6, 2017. (Tr. at 6-7.) However, the Appeals Council found that, as of December 7, 2017, Plaintiff had changed age categories from a "younger person" to a "person closely approaching advanced age." (Tr. at 7 (citing 20 C.F.R. § 404.1563(c-d).) Based on this change in age category, the Appeals Council found that Plaintiff was disabled as of December 7, 2017. (Tr. at 7-8.)

On March 3, 2018, Plaintiff commenced this action seeking judicial review of the ALJ's decision and of the Appeal's Council's affirmation of that decision. (*See* ECF No. 1.) In her Complaint, Plaintiff claims that the decision of the ALJ is "clearly erroneous in law and fact." (*Id*. at 2.) Plaintiff further asserts, in her brief submitted to this Court pursuant to Local Civ. Rule. 9.1, that "substantial evidence exists in the administrative record to support a finding of disability." (ECF No. 10 at 5.) As for relief, Plaintiff requests "[t]hat this Court reverse the defendant's decision denying the plaintiff's application and declare that the plaintiff is entitled to a period of

13

disability beginning July 30, 2013" or, in the alternative, "[t]hat this Court vacate the defendant's decision . . . and remand this case for a new hearing in accordance with" the Act.  (ECF No. 1 at 2.)

## II. STANDARD OF REVIEW

This Court's review of a final decision of the Commissioner is limited to an assessment of whether the decision rests on the proper application of the law and is supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) (stating that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive); *see also Diaz v. Comm'r of Soc. Sec.,* 577 F.3d 500, 503 (3d Cir. 2009); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate as adequate to support a conclusion."  *Diaz*, 577 F.3d at 503 (citations omitted).  Moreover, "[i]n determining whether there is substantial evidence to support an administrative law judge's decision," the Court "owe[s] deference to" the ALJ's "evaluation of the evidence, assessment of the credibility of witnesses, and reconciliation of conflicting expert opinions."  *Id*. at 506; *see also Schaudeck v. Comm'r of Soc. Sec. Admin*., 181 F.3d 429, 431 (3d Cir. 1999) (stating that, "[o]verall, the substantial evidence standard is deferential and includes deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence").

## III. DISCUSSION

The Social Security Act gives the Commissioner authority to pay social security benefits to disabled persons.  *See* 42 U.S.C. §§ 423(d), 1382.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner applies a five-step test to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. The first two steps require the claimant to demonstrate that she is not currently engaging in substantial gainful activity, and that she is suffering from a severe impairment. *Id*. A failure of proof at step one or step two renders the claimant ineligible for benefits. *See Dismuke v. Comm'r of Soc. Sec.*, 309 F. App'x 613, 615 (3d Cir. 2009) (citing *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999)). If, however, the claimant progresses to step three, then the question becomes "whether the impairment is equivalent to one of a number of Listed Impairments [as articulated in 20 C.F.R. Pt. 404, Subpart P, Appendix 1] that the Commissioner acknowledges are so severe as to preclude substantial gainful activity." *Id*. at 616 (quoting *Knepp v. Apfel*, 204 F.3d 78, 84 (3d Cir. 2000). If the claimant's specific impairment is not one of the Listed Impairments, the ALJ must then consider whether the claimant's impairment or combination of impairments is "medically equivalent" to one of the Listed Impairments. *See* 20 C.F.R. § 404.1526(a).

An impairment or combination of impairments is "medically equivalent" to one of the Listed Impairments if it is "at least equal in severity and duration to the criteria of any [L]isted [I]mpairment." *Id*. In other words, the claimant's impairment "must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Dismuke*, 309 F. App'x at 616 (quoting *Williams v. Sullivan*, 970 F.2d 1178,

15

1186 (3d Cir. 1992) (emphasis in original).  A claimant who satisfies step three "is conclusively presumed to be disabled." *Id*. (quoting *Knepp*, 204 F.3d at 84).  A claimant who fails at step three must continue to steps four and five.

At step four, the question is "whether the claimant retains the residual functional capacity to perform her past relevant work." *Dismuke*, 309 F. App'x at 616 (quoting *Plummer*, 186 F.3d at 428." It is the claimant's burden to establish an inability to return to her past relevant work.  *See id*.  A failure of proof at step four dooms the claimant's case.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, however, the claimant satisfies this burden, then the burden of production shifts to the Commissioner to show, at step five, that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity." *Dismuke*, 309 F. App'x at 616 (quoting *Plummer*, 186 F.3d at 428).  This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the cumulative effect of all of the claimant's impairments renders her capable of working. *See* 20 C.F.R. § 404.1520(g).

In this appeal, Plaintiff argues that the decision of the ALJ (as modified by the Appeals Council) is not supported by substantial evidence.  She specifically challenges the ALJ's determinations at steps three and five.  At step three, the ALJ concluded that Plaintiff's claimed medical impairments did not meet or medically equal one of the Listed Impairments.  (Tr. 17-20.) At step five, the ALJ found that Plaintiff had the residual functional capacity to perform a

significant number of jobs in the national economy.[4] (Tr. 20-28.) Plaintiff raises several arguments to challenge these conclusions, which, for the following reasons, I find unpersuasive.

Plaintiff first contends that the ALJ erred in arriving at his determination at Step Three by failing to properly compare Plaintiff's claimed medical impairments with the Listed Impairments and by failing to sufficiently consider whether the combined effect of Plaintiff's claimed medical impairments are medically equivalent to a Listed Impairment. I disagree. At Step Three, the ALJ was required to consider each of Plaintiff's individual conditions in determining whether a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 was satisfied. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). In addition, if Plaintiff has "a combination of impairments, no one of which meets a listing," the regulations required the ALJ to "compare [the claimant's] findings with" other potential "analogous listed impairments." *See* 20 C.F.R. § 404.1526(b)(3). Here, the ALJ's decision adhered to these requirements. The ALJ explicitly found, in his decision, that "[t]he claimant *does not have an impairment or combination of impairments* that meets or medical equals the severity of one of the listed impairments." (Tr. at 17 (emphasis added).) Numerous courts within this District have found that where the ALJ has indicated that a claimant's impairments have been considered in combination, there is "no reason not to believe" that the ALJ did so. *Granados v. Comm'r of Soc. Sec.*, No. 13-781, 2014 WL 60054 at *9 (D.N.J. Jan. 7, 2014) (quoting *Morrison v. Comm'r of Soc. Sec.*, 268 F. App'x 186, 189 (3d Cir. 2008)); *Gainey v. Astrue*, No. 10-1912, 2011 WL 1560865, at *12 (D.N.J. Apr. 25, 2011) (same)). Moreover, in making his

---

[4] The ALJ arrived at this conclusion after considering the testimony of the vocational expert. Specifically, the vocational expert opined that an "individual with [Plaintiff]'s age, education, work experience, and residual functional capacity . . . would be able to perform the requirements of representative occupations such as inspector (DOT Code #669.687-014, with approximately 12,000 jobs in the national economy); assembler (DOT Code #713.687-018, with approximately 30,000 jobs in the national economy); and surveillance system monitor (DOT Code # 379.367-010, with approximately 24,000 jobs in the national economy). (Tr. 27.)

determination at step three, the ALJ appears to have thoroughly engaged in an analysis of the evidence that was presented with respect to each of Plaintiff's claimed impairments.[5]  Indeed, the ALJ was "not required to repetitively analyze each symptom at each step; rather, the requirement is that the decision be subject to 'meaningful review' by a reviewing court." *Trzeciak v. Colvin*, No. 15-6333, 2016 WL 4769731, at *5 (D.N.J. Sept. 12, 2016) (quoting *Wilkinson v. Colvin*, No. 12-6180, 2014 WL 1316056, at *8 (D.N.J. Apr. 1, 2014)).  *Cf. Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000) (providing that ALJ at step three must provide a sufficient framework of reasoning for a court to conduct "meaningful judicial review" of the ALJ's decision).  The ALJ clearly set forth the reasons for his conclusions, and there is substantial evidence in the record to support those conclusions.

Next, Plaintiff asserts that the ALJ erred in arriving at his determination regarding the residual functional capacity of Plaintiff, because the ALJ's decision did not adequately explain how Plaintiff could do any work on a sustained basis.  Again, I disagree.  In calculating Plaintiff's residual functional capacity, the ALJ considered all of Plaintiff's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements" of the Act.  (Tr. at 20.)  The ALJ specifically identified Plaintiff's complaints of severe anxiety and depression, her problems with memory, concentration, social functioning, fatigue, and hypersomnolence, and her history of lupus with fibromyalgia.  (Tr. at 20-26.)  For instance, after examining the objective medical evidence

---

[5] Plaintiff's reliance on the Third Circuit's unpublished decision in *Torres v. Commissioner*, 279 Fed. Appx 149 (3d Cir. 2008), is misplaced.  In *Torres*, the ALJ's "entire combination analysis consisted of one cursory paragraph," with no development of the record, or explanation as to the ALJ's medical determinations.  279 F. App'x. at 149.  Unlike in that case, the ALJ in this case rendered a decision that indicates that the ALJ engaged in a thorough evaluation of the pertinent medical and other evidence.  Moreover, even if the Court were to find that the ALJ's discussion at step three was insufficiently cursory in this case, the Court notes that there is abundant evidence in the record to support the conclusions made by the ALJ.

(including x-rays, EMGs, and MRIs), the ALJ explained that "evidence of neurological and degenerative changes affecting the claimant's cervical spine and extremities, together with the positive diagnosis of lupus . . . supports a residual functional capacity for sedentary work with occasional postural activities, but no climbing of ladders, ropes, and scaffolds, frequent reaching with the upper right extremity, and frequent bilateral handling and fingering." (Tr. at 26.) The ALJ further considered Plaintiff's reports of headaches and pain in finding that she should avoid exposure to extreme temperatures, wetness and humidity, excessive vibration, pulmonary irritants, and other hazards. (Tr. at 22.) In his analysis, the ALJ also considered non-exertional limitations on Plaintiff's capacity to perform simple, routine tasks by, for example, crediting evidence of Plaintiff's depressed mood and her prior hospitalization. (Tr. at 23.) Finally, the ALJ considered evidence regarding Plaintiff's daily activities, finding that those activities supported a residual function capacity for a reduced range of sedentary, simple work activity. (Tr. at 24.) More importantly, other than claiming that the ALJ did not explain his decision—which he did—Plaintiff has failed to point to any contradictory evidence in the administrative record for this Court to consider that would tend to show that Plaintiff could not have performed any sedentary work. That failure is fatal to Plaintiff's appeal. Rather, there is substantial evidence in the record to support the ALJ's conclusions with respect to the residual functional capacity of Plaintiff, and the ALJ's analysis of that evidence appears to have been thorough.

## IV.   CONCLUSION

For the reasons set forth above, the Court concludes that the ALJ correctly applied the applicable law and that there is substantial evidence in the record to support the determination by the Commissioner that Plaintiff was not disabled between July 30, 2013 and December 6, 2017.

Therefore, the final decision of the Commissioner is **AFFIRMED**. An appropriate Order accompanies this Opinion.

DATED:  August 3, 2020                                        /s/ Freda L. Wolfson
                                                              Hon. Freda L. Wolfson
                                                              U.S. Chief District Judge